ACCEPTED
13-14-00059-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
9/28/2015 9:44:36 PM
Dorian E. Ramirez
CLERK

No. 13–14–00059–CR

# COURT OF APPEALS
## FOR THE THIRTEENTH JUDICIAL DISTRICT
## CORPUS CHRISTI/ EDINBURG, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
9/28/2015 9:44:36 PM
DORIAN E. RAMIREZ
Clerk

| | | |
|---|---|---|
| **MONICA GALVAN,** | § | |
| **Appellant,** | § | **Appeal from the** |
| | § | **347th Judicial District Court** |
| **versus** | § | **of Nueces County, Texas** |
| | § | **Cause No. 11–CR–3519–H** |
| **THE STATE OF TEXAS,** | § | |
| **Appellee.** | § | |

## REPLY BRIEF FOR APPELLANT

## ORAL ARGUMENT REQUESTED
[Scheduled October 15, 2015]

**DANTE E. DOMINGUEZ**
**Bar No. 24086677**
**LAW OFFICE OF DANTE ELI DOMINGUEZ**
**310 S. St. Mary's St.**
**Suite 1215**
**San Antonio, Texas 78205**
**210-227-9399**
**210-229-1445 facsimile**
**E-mail: ddominguez.law@gmail.com**

# TABLE OF CONTENTS

Index of Authorities ....................................................................................1

Prayer ...................................................................................................19

Certificate of Compliance ..........................................................................20

Certificate of Service ...............................................................................21

Appendix……………………………………………………………………….22

# INDEX OF AUTHORITIES

**Cases:**

*Brooks v. State*, 323  S.W.3d 893 (Tex. Crim. App. 2010)…………………………..3

*Elliot v. State*, No. 13-13-00220-CR, 2015 WL 1869472 (Tex. App—Corpus Christi, April 23, 2015)…………………………………………………12, 13, 14

*Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)……………………………………………………......................3

*Johnson v. State*, 364 S.W.3d 742 (Tex. Crim. App. 2012)…………………..16, 17

*Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009)………………………...11

*Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005)………………………….18

*Rodriguez v. State*, 834 S.W.2d 488 (Tex. App.—Corpus Christi 1992, no writ.)………………………………………………………..13, 14

*Trepanier v. State*, 940 S.W.2d 827 (Tex. App.—Austin 1997, writ ref'd)........................................................................12, 13, 14, 15

*Williams v. State*, 235 S.W.3d 742 (Tex. Crim. App. 2007)…………….11, 13, 15

**Rules and Statutes:**

Texas Penal Code § 22.05…………………………………………………...19

Texas Transportation Code § 545.401……………………………………………19

# COURT OF APPEALS
## FOR THE THIRTEENTH JUDICIAL DISTRICT
## CORPUS CHRISTI/ EDINBURG, TEXAS

| | | |
|---|---|---|
| **MONICA GALVAN,** | § | |
| **Appellant,** | § | **Appeal from the** |
| | § | **347th Judicial District Court** |
| **versus** | § | **of Nueces County, Texas** |
| | § | **Cause No. 11–CR–3519–H** |
| **THE STATE OF TEXAS,** | § | |
| **Appellee.** | § | |

## REPLY BRIEF FOR APPELLANT, MONICA GALVAN

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS, THIRTEENTH JUDICIAL DISTRICT:

Appellant, MONICA GALVAN, by and through undersigned counsel submits this, her Reply Brief, and seeks that her conviction be reversed and the judgement of the trial Court be rendered, or in the alternative, that she be granted a new trial.

### INSUFFICIENT EVIDENCE

Points of Error 1 and 2 of Appellant's Brief argue that "The Evidence is Legally Insufficient To Sustain Conviction." The State must produce "sufficient

evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 313 (1979). This "is a test of adequacy, not mere quantity." *Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010) (Cochran, J., concurring). Evidence "cannot be 'semi-sufficient,'" it either is or is not legally sufficient to support a conviction. *Id*. at 913.

The State's brief lists out, by bullet point, the evidence upon which it relies to sustain Appellant's conviction. State's Brief at 22–23. For example, the State's simple, three word sentence, "Appellant was intoxicated," is without foundation in the record. State's Brief at 22. In support of that statement, the State provided two citations. The first cites the testimony of the arresting officer, as he described his decision to arrest Mrs. Galvan-Manka on the night of the accident [3RR26–27], and the second citation, "4 R.R. at 47" is a page in the record in which Mr. Manka speculates, due to his poor memory of the day in question, as to how he arrived in Corpus Christi from Alice, Texas, and the plans that he and Mrs. Galvan-Manka had for that night. 4RR47. The State's brief also cites the testimony of "Emily Bovino, a forensic scientist with the Department of Public Safety," [State's Brief at 9–10], whose testimony included that "at the time of the collision, Appellant's blood alcohol level would have been anywhere between .10 and .15. 4 R.R. at 98-99 & 104-105." State's Brief at 10. This testimony, is based upon a hypothetical

3

asked by the State which did not include significant factors that are in the facts of this case. The State asked Ms. Bovino:

> Q. If I were to give you the hypothetical of say 120 to 130 pound person, female, rather who had three beers and one shot between the hours of 10:00 and 11:00, stopped drinking at 11:00, what could you tell the court about their BAC at 11:22?...
> 4RR98.
>
> Q. Can you tell me one more time what based on our little hypothetical you thought her blood alcohol level would be right at 11:22?
> A. I would say if she is an average human, based on elimination rates, et cetera, I would say her BAC would be anywhere between a .10 and a .15.
> 4RR99.

This hypothetical rests upon the State's assumption of the times in this case and fails to take into account that Mrs. Galvan-Manka ate at Whataburger after leaving the Pelican's Lounge. 4RR22. This testimony was further debunked by Dr. Gary Wimbish who testified that Mrs. Galvan-Manka's blood alcohol concentration "would have been lower at the time of the accident rather than post-accident… .05 is very reasonable" as to her probable blood alcohol level. 4RR158.

The State's Brief attempts to advance the State's trial theory that Mrs. Galvan-Manka and Mr. Manka were angry with one another and engaged in a fight immediately before the accident, and that the exchange between the two led to the accident. The State's Brief states, "[a] couple of seconds before the collision,

4

Appellant was arguing with Manka and striking him on the shoulder three times to make him shut up. 4 R.R. at 27, 33 & 96-97." State's Brief at 22 (citing the testimony of Joseph Salinas).

Mr. Salinas' testimony on the "tapping" [4RR96] clearly describes that the event was not a forceful exchange, stating, it was "[m]ore like a 'be quiet.' There was not excessive force behind that." 4RR33. Further, Mr. Salinas testified that the tapping had nothing to do and did not cause the accident. 4RR96. Mr. Salinas testified,

> A. … We wrecked afterwards.
> Q. What was the time lapse in between?
> A. I don't remember. I know there was a bit of a hiatus, possibly a minute or so.
> Q. Do you remember that it was a minute or?
> A. You know a minute, couple of minutes.
> Q. Do you remember the vehicle swerving at all?
> A. No.

It is clear that Mr. Salinas, the person relied upon by the State to show that an altercation had taken place immediately before the accident, did not testify as such.

The State's Brief also states that "[r]ather than following the slight bend in the road, Appellant drove straight off the roadway and never veered. 3 R.R.at 34." State's Brief at 22. At trial the arresting officer placed an "X" on a map provided by the State to mark the accident location. 3RR18. The State's Exhibit clearly

5

shows that the stretch of road is a straightaway and does not curve. SE1–3; 10RR23–25.

The State's Brief includes in its bullet point list,

● Just before the collision, Appellant's vehicle was observed swerving and fishtailing. 5 R.R. at 7.
● Rather than following the slight bend in the road, Appellant drove straight off the roadway and never veered. 3 R.R. at 24.
State's Brief at 22.

These statements are contradictory. One has Mrs. Galvan-Manka "swerving and fishtailing" as though she lost control of her vehicle after attempting to perform an evasive maneuver; and the other has Mrs. Galvan-Manka driving "straight off the roadway," without veering, into a collision. Mrs. Galvan-Manka testified that upon seeing a vehicle, without its lights on, approaching her, she veered to avoid a collision. 5RR51. This is consistent with her having to take an evasive maneuver to avoid a collision.

The State's contention that "[a]fter the collision, Appellant disposed of the beer bottles in a location where they were not likely to found. 3 R.R. at 48-49 & 51" [State's Brief at 22] attempts to characterize that action as though Mrs. Galvan-Manka took steps to remove evidence. That is clearly not the case. Some of the beer bottles at the feet of Mr. Manka were broken [5RR53] and Mrs. Galvan-Manka took this action, in view of Mrs. Cepeda, because the bottles were

6

underneath the feet of Mr. Manka [5RR52] and Mrs. Galvan-Manka was concerned that "it would cut Chris when I was trying to get him out." 5RR53. It is reasonable for one to remove sharp pieces of broken glass, from the feet of an injured person trapped in a vehicle. It also shows that Mrs. Galvan-Manka was in control of her mental and physical faculties, as she was taking action to help the situation following the accident.

The State's Brief states that "Appellant contends that since the jury acquitted [Mrs. Galvan-Manka] of the intoxication assault charges, those verdicts preclude a finding that she was impaired. Appellant's Brief at 14." State's Brief at 24. This is a mischaracterization of Appellant's Brief. The statement to which the State refers is when Appellant's Brief points out that the jury acquitted Mrs. Galvan-Manka of intoxication assault [6RR51–52] and goes on to state "[t]his is further indication that Mrs. Galvan-Manka did not drink enough to become intoxicated." Appellant's Brief at 14.

The State's Brief incorrectly contends that "Appellant misstates the evidence." State's Brief at 21. The State's Brief then attempts to point out four (4) instances in which the State claims that the Appellant's Brief misstated the evidence. *See* Id.

First, the State points out that on page 31, the Appellant's Brief indicates that "the highest rate of speed she was reported driving was only <u>58</u> miles per hour [4RR111]." This is indeed correct. Officer Connor explained that the "pre-crash data" revealed the speed of the vehicle "five seconds prior to the crash" and the highest speed the system reported was "58 miles an hour, according to the data that was received in the air bag control module." 4RR111. The speed then decreased to forty-seven (47) miles per hour, one (1) second prior to the collision. 4RR112.

Second, the State takes issue with the Appellant's Brief stating that Mrs. Galvan-Manka had "two Michelob Ultra beers." State's Brief at 21. Appellant's Brief is consistent with Mrs. Galvan-Manka's testimony that she had "two to three drinks of Michelob Ultra" [5RR49] and the next sentence of Appellant's Brief cites the testimony of Joseph Salinas who testified, "Monica did not have no more than two drinks." 4RR20. Appellant's Brief also includes:

> As to the amount of alcohol Mrs. Galvan-Manka drank that night, the testimony is clear as well. Mrs. Galvan-Manka testified that she "had two to three drinks of Michelob Ultra," an extremely light beer. 5RR49. Mr. Salinas testified that he was certain that Mrs. Galvan-Manka had "no more than two drinks," as he "would not have gotten in the car otherwise." 4RR20. Mr. Manka testified that although he, understandably due to the accident, could not specifically remember how many drinks Mrs. Galvan-Manka had that night, he has "never seen her drink more than three drinks in [his] entire life." 4RR61. In the, more than a decade, that he has known Mrs. Galvan-Manka, he has "never seen her take a shot," [4RR62] and he has never seen her drunk. 4RR50. According the Officer Ramirez's report, to which he

8

referred during his testimony, Mrs. Galvan-Manka reported to him that she had "three beers and… A bull blaster shot." 3RR54–55. Appellant's Brief at 14.

It is clear that the Appellant's Brief did not attempt to mischaracterize the testimony regarding the amount of alcohol Mrs. Galvan-Manka consumed the night of the accident.

Third, the State's Brief takes issue with the statement in Appellant's Brief that "Mrs. Cepeda testified that she could smell alcohol on the scene, moments after Mrs. Galvan-Manka removed the broken bottles from the feet of Mr. Manka." Appellant's Brief at 8. *See* State's Brief at 21. Appellant's brief cites 5RR11, and does not misstate the testimony, as Mrs. Cepeda testified,

> Q. Okay. Did you hear any noise when she threw it?
> A. It sounded like glass.
> Q. Did you observe anything else when you were nearby the defendant?
> A. I could smell alcohol when she was trying to rouse the young man. She was just acting really scared. I am sure she was. I would have been too. Just seem to be in a hurry, seemed to be anxious for him to wake up. I could smell alcohol on her breath when we were at the window.
> 5RR11.

As quoted above, Mrs. Cepeda testified that after hearing the sound of glass being thrown, she "could smell alcohol when [Mrs. Galvan-Manka] was trying to rouse" Mr. Manka. 5RR11. Appellant's Brief also states that Officer Ramirez testified

9

that he could smell alcohol on Mrs. Galvan-Manka's breath.  Appellant's Brief at 16; 3RR24.

Four, on page 21, the State's Brief takes issue with the Appellant's Brief referencing "the broken beer bottles on the floorboard of the vehicle."  *See* Argument section of Appellant's Brief at 32.  This reference is consistent with the testimony of Mrs. Galvan-Manka,

> Q. The six pack, where was that before the accident?
> A. It was underneath Christopher.
> Q. Under his leg?
> A. Under his legs in the front seat, yes.
> 5RR52.
>
> Q. So some of those bottles in the six pack were broken?
> A. Yes.
> Q. Some were not?
> A. A lot of them were broken. Yeah, there were some that were not broken.
> Q. You threw them out why?
> A. Because I was worried that it would cut Chris when I was trying to get him out.
> 5RR53.

The State points out that Mrs. Cepeda testified that "Once I looked in the window, I could see blood on the man's face and again she was right next to me when she was trying to wake him. Then eventually she ran around the back of the vehicle and started doing something in the vehicle."  5RR10.  As such, saying that "the smell of alcohol at the scene can be explained by the broken bottles of beer on the

floorboard of the vehicle" [Appellant's Brief at 32] is clearly not a misstatement of the evidence.

The State's Brief states the correct standard of review for a reviewing court to examine the legal sufficiency of the evidence and includes that "[a]s long as the verdict supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable." *Laster v. State*, 275 S.W.3d 512, 523 (Tex. Crim. App. 2009). However, the State's Brief does not mention, as cited by Appellant's Brief, *Williams v. State*, 235 S.W.3d 742 (Tex. Crim. App. 2007), in which the Court of Criminal Appeals "granted appellant's petition for discretionary review to examine the culpable mental state of recklessness." *Williams*, 235 S.W.3d at 745. In *Williams*, the Court thoroughly discussed the culpable mental state of recklessness, as described in Appellant' s Brief, and the Court stated,

> ***Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it***. Such a "devil may care" or "not giving a damn" attitude toward the risk distinguishes the culpable mental state of criminal recklessness from that of criminal negligence, which assesses blame for the failure to foresee the risk that an objectively reasonable person would have foreseen.
> *Williams*, 735 S.W.3d at 751–52 (emphasis added) (internal citations omitted).

The State's Brief argues that,

> in a case of this nature, the defendant need not be aware of the specific risk posed to another. *Trepanier v. State*, 940 SW2d at 829; Elliott, 2015 WL 1869472, at *3. "[W]hat matters is that she consciously created an unjustified risk of danger to others." *Elliott*, 2015 WL 1869472, at *3.
> State's Brief at 25.

The State's Brief relies heavily upon *Elliot v. State*, No. 13-13-00220-CR, 2015 WL 1869472 (Tex. App—Corpus Christi, April 23, 2015)[1] and *Trepanier v. State*, 940 S.W.2d 827 (Tex. App.—Austin 1997, writ ref'd).

In *Elliot*, this Honorable Court examined a case in which the appellant admitted "that she was intoxicated, fatigued, and distracted on the road [which] demonstrated to a rational jury that she consciously created a substantial and unjustifiable risk of danger to others." *Elliot*, 2015 WL 1869472 at *3. Further, "the jury could have inferred appellant's recklessness from her furtive conduct after the accident that demonstrated her consciousness of guilt." *Id*. at *4. This furtive conduct included, continuing to drive after she hit a pedestrian, making no attempt to stop, going to an auto glass shop the next morning to replace her broken windshield, telling someone that she was "too drunk" to remain at the scene of the incident and she fled the scene to avoid arrest, and using bleach to wash the blood

---

1 Included in Appendix.

12

from her vehicle.  *Id.*   The facts of *Elliot* are strikingly different from the facts in this case, especially the admissions made by the appellant in *Elliot*.

The State concedes this fact and states,

> While Appellant made no such concession in this case, there is sufficient evidence in the record from which the jury could have reasonably concluded that Appellant created a substantial and unjustifiable risk of danger to others. *See Trepanier*, 940 SW2d 827, 830 (Tex. App.-Austin 1997, pet. ref'd) (despite lack of concession by appellant, evidence was sufficient to show that appellant created a substantial and unjustifiable risk).
> State's Brief at 23–24.

The State ignores the Court of Criminal Appeals' instruction that "[r]eckless requires the defendant to actually foresee the risk involved and to consciously decide to ignore it." *Williams*, 235 S.W.3d at 751.

*Trepanier v. State*, 940 S.W.2d 827 (Tex. App.—Austin 1997, writ ref'd), is a case decided a decade prior to the Court of Criminal Appeals' decision in *Williams v. State,* 235 S.W.3d 742 (Tex. Crim. App. 2007).  In *Trepanier*, the appellant was convicted of manslaughter after "rapidly accelerating" away from a red light, cutting "between cars in the middle and right lanes until he reached the unimproved right shoulder of the road," and passing a delivery "truck on the right, driving on the shoulder of the road" killing a bicyclist.  *Trepanier*, 940 S.W.2d at 828.  The court in *Trepanier* cited *Rodriguez v. State*, 834 S.W.2d 488 (Tex.

App.—Corpus Christi 1991, no writ)[2], and noted that unlike *Rodriguez*, the appellant in *Trepanier* did not make a concession, however,

> there was sufficient evidence from which a reasonable juror could have concluded beyond a reasonable doubt that Trepanier voluntarily created a substantial and unjustifiable risk when he moved onto the shoulder in order to pass the delivery truck on the right, and that he consciously disregarded the risk of killing a bicyclist traveling legally on that shoulder when he continued on around the delivery truck.
> *Trepanier*, 940 S.W.2d at 829.

This Honorable Court cited *Trepanier* in its decision in *Elliot* for the proposition that "In a manslaughter case, the jury is not required to find that a defendant was aware of the specific risk of the victim's death to find recklessness," noting that the specificity of knowing a particular victim could be injured was not required. *Elliot*, 2015 WL 1869472 at *3. This Honorable Court went on to describe that the appellant in *Elliot* was quite aware of the danger she caused, as her admission, described above, indicated. *Id*. at *3–4.

This Honorable Court also cited *Trepanier* in a footnote in *Elliot* as an example of finding recklessness in driving. *Id*. at *3, n. 3 ("determining driver was reckless when he attempted to illegally pass traffic on right shoulder of the road"). The aforementioned footnote cites four (4) cases in which appellate courts have upheld the legal sufficiency of convictions involving the culpable mental state of

---

2 The facts and holding of *Rodriguez v. State*, 834 S.W.2d 488 (Tex. App.—Corpus Christi 1992, no writ) are discussed in Appellant's Brief pages 29–30, and distinguished from the present case at page 32.

14

recklessness and drivers who blatantly disregarded safety. *Id.* All but *Trepanier* were cited in Appellant's Brief, which cites a total of seven (7) cases and distinguishes the facts in those cases which would lead to a finding of recklessness, from the facts in this case. *See* Appellant's Brief at 27–33.

The actions of Mrs. Galvan-Manka and the situation she entered into by driving on the night of the accident do not amount to a substantial and unjustifiable risk which she consciously decided to take. Further, there is no evidence to support that Mrs. Galvan-Manka "actually [did] foresee the risk and consciously decide to ignore it" as required by *Williams v. State*, 235 S.W.3d 742 (Tex. Crim. App. 2007). Even in a light most favorable to the verdict, there is insufficient evidence for a rational juror to conclude that Mrs. Galvan-Manka acted recklessly and her conviction should be reversed.

**EVIDENCE INSUFFICIENT TO PROVE
THE ALLEGATIONS IN THE INDICTMENT
AND IN THE CHARGE OF THE COURT**

Appellant's Points of Error 3 and 4 argue that the State failed to produce any evidence that Mrs. Galvan-Manka crasher her vehicle "INTO AND AGAINST A BULLDOZER" as alleged in the indictment [1CR3–5] and as was instructed in the Charge of the Court [1CR1261–68, paragraphs 10–11]. This was a fatal variance

and Mrs. Galvan-Manka's rights to due process and due course of law were violated.

In its brief, the State cites the same cases as Appellant, with the addition of *Johnson v. State*, 364 S.W.3d 292 (Tex. Crim. App. 2012). In *Johnson*, which the State's Brief relied heavily upon, the variance involved "the charged acts of 'hitting the victim with his hand' and 'twisting the victim's arm with his hand' versus the proved act of 'throwing the victim against the wall.'" *Johnson*, 364 S.W.3d at 298. The Court provided the following example to illustrate the variance it was examining,

> "Stabbing with a knife" and "bludgeoning with a baseball bat" are two possible ways of murdering Dangerous Dan, but they do not constitute separate offenses. These methods of committing murder do describe an element of the offense: the element of causation. But murder is a result-of-conduct crime. What caused the victim's death is not the focus or gravamen of the offense; the focus or gravamen of the offense is that the victim was killed.
> *Id.*

The Court goes on to explain that this type of variance cannot be material because it cannot show "an 'entirely different offense' than what was alleged." *Id*.

Here, the State's use of "bulldozer" as the object struck by Mrs. Galvan-Manka's vehicle was heavily relied upon by the State, as described in Appellant's Brief. Unlike *Johnson*, this is not the difference between an allegation that the defendant hit another with his hand and twisted the arm of another with his hand,

versus throwing another into a wall, this is the difference between twisting the arm of the victim and throwing the victim off of the Grand Canyon. *See Johnson*, 364 S.W.3d at 298. The variance in this case was utilized again and again by the State to conjure notions within the minds of the jury of Mrs. Galvan-Manka plowing her vehicle into a steel bulldozer, capable of destroying buildings. The testimony of Officer Ramirez is one example of this reliance, "It was not an average accident. She had crashed into a bulldozer which never happens. I've never seen that before in my ten years." 3RR32. Officer Ramirez then admits that he does not know if it was a bulldozer and another officer described it differently. 3RR33. The State latched onto the term bulldozer to promote the effects of that term. The use of this term prejudiced Mrs. Galvan-Manka and impaired her ability to prepare her defend herself against an object which the State would describe over and over, but never show. This prejudiced Mrs. Galvan-Manka and her conviction should be overturned.

## NON-UNANIMOUS VERDICT

Appellant's Point of Error 5 argues that the Charge of the Court and the closing argument of the State resulted in a non-unanimous verdict.

The State's Brief contends that trial counsel did not object to the change in the Charge of the Court, which the State argued in closing. State's Brief at 31.

17

However, the trial court and the State were on notice of the object to the change. The State requested a change "in Courts 3 and 4 to change 'and' to 'or'" and stated, "I have case law coming on that." 5RR73–74. The trial court then went into recess. 5RR74. In arguing the Motion for New Trial, defense counsel reminded the trial court that the State, in its indictment, listed "a litany of things that the defendant did wrong but when it came to charging the jury on the guilt innocence charge, they wanted to use the word 'or.' We objected to it…" 9RR24. This served the purpose of objecting to the change in the Charge of the Court which the State argued in closing arguments.

The State's Brief contends that reliance on *Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005), "is misplaced because that case dealt with an indictment that contained three paragraphs within a single count that alleged three distinct offenses." State's Brief at 31–32. In *Ngo*, the Court of Criminal Appeals stated,

> The State is mistaken in its first argument that the trial court simply submitted a single "credit card abuse" offense with three different statutory manners and means. The phrase "manner or means" describes how the defendant committed the specific statutory criminal act. It does not mean that the State can rely upon a laundry list of different criminal acts and let the individual jurors take their pick on which each believes the defendant committed.
> *Ngo*, 175 S.W.3d at 745.

18

Here the State, relying on the Charge of the Court argued to the jury, "juror number 6 could think that it is by failing to keep the motor vehicle operated by the defendant on the roadway while juror number 7 could say it is by operating a motor vehicle while impaired." 6RR9. The Charge of the Court, as illustrated by this statement by the State allowed the jurors to convict Mrs. Galvan-Manka of crimes which could range from Reckless Driving, [Tex. Transp. Code Ann. § 545.401(a) ("A person commits an offense if the person drives a vehicle in wilful or wanton disregard for the safety of persons or property.")] to Deadly Conduct [Tex. Penal Code Ann. § 22.05 (a) ("A person commits this offense is he recklessly engages in conduct that places another in imminent danger of serious bodily injury.").

As argued by Appellant's Brief, this resulted in a non-unanimous verdict, which harmed Mrs. Galvan-Manka. Thus, her conviction should be reversed.

### PRAYER

As the evidence was legally insufficient to sustain Mrs. Galvan-Manka's conviction, it should be reversed and rendered. With regard to all other error, Mrs. Galvan-Manka respectfully requests that her conviction be reversed and she be granted a new trial.

19

Respectfully submitted:

DANTE ELI DOMINGUEZ
Bar No. 24086677
Law Office of Dante Eli Dominguez
310 S. St. Mary's St.
Suite 1215
San Antonio, Texas 78205
Phone: (210) 227-9399
Facsimile: (210) 229-1445
E-mail: ddominguez.law@gmail.com

By:_____/*s*/_____
          DANTE ELI DOMINGUEZ

Attorney for Appellant,
MONICA GALVAN

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document does comply with the word-count limitations of Tex. R. App. P. 9.4(i) because it contains 4,172 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

By:_____/*s*/_____
          DANTE ELI DOMINGUEZ

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above foregoing Appellant's Brief has been served electronically, in compliance with Tex. R. App. P. 9.5(b)(1) to Mark Skurka, District Attorney, 901 Leopard Street, Room 206, Corpus Christi, Texas, on this the 28th day of September, 2015.

By:_____/*s*/_____
DANTE ELI DOMINGUEZ

**No. 13–14–00059–CR**

**COURT OF APPEALS
FOR THE THIRTEENTH JUDICIAL DISTRICT
CORPUS CHRISTI/ EDINBURG, TEXAS**

---

| | | |
|---|---|---|
| **MONICA GALVAN,** | § | |
| **Appellant,** | § | **Appeal from the** |
| | § | **347th Judicial District Court** |
| **versus** | § | **of Nueces County, Texas** |
| | § | **Cause No. 11–CR–3519–H** |
| **THE STATE OF TEXAS,** | § | |
| **Appellee.** | § | |

---

**REPLY BRIEF FOR APPELLANT**

**APPENDIX**

---

*Elliot v. State*, No. 13-13-00220-CR, 2015 WL 1869472
(Tex. App—Corpus Christi, April 23, 2015).

22

**2015 WL 1869472**
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

DO NOT PUBLISH. TEX. R. APP. P. 47.2(B).
Court of Appeals of Texas,
Corpus Christi-Edinburg.

Tabatha Elliott, Appellant,
v.
The State of Texas, Appellee.

NUMBER 13–13–00220–CR | Delivered and filed
April 23, 2015

**On appeal from the 319th District Court of Nueces County, Texas. Thomas Greenwell, Judge**

**Attorneys and Law Firms**

Andrew W. Loveall, Attorney at Law, Corpus Christi, TX, for Appellant.

Mark Skurka, District Attorney, Douglas K. Norman, Asst. District Attorney, Corpus Christi, TX, for The State.
Before Chief Justice Valdez and Justices Garza and Longoria

**MEMORANDUM OPINION**

Memorandum Opinion by Chief Justice Valdez

**\*1** A jury found appellant, Tabatha Elliot, guilty of manslaughter, *see* TEX. PENAL CODE ANN. § 19.04 (West, Westlaw through 2013 3d C.S.), tampering with or fabricating physical evidence, *see id.* § 37.09 (West, Westlaw through 2013 3d C.S.), and accident involving personal injury or death, *see* TEX. TRANSP. CODE ANN. § 550.021 (West, Westlaw through 2013 3d C.S.). By four issues, which we have reorganized, appellant contends (1) the evidence was legally insufficient for a rational jury to convict her of manslaughter; (2) the trial court erred in allowing the State to introduce certain evidence concerning the situs of the accident on the basis that it constituted an improper expert or lay opinion and unfairly prejudiced her

defense; (3) the trial court erred in not allowing appellant to cross-examine several State's witnesses on their personal driving habits to determine how an ordinary person would operate a vehicle; and (4) the trial court erred in denying her motion to suppress text messages found on appellant's company-issued phone under the Fourth Amendment. We affirm.

**I. Background[1]**

On May 29, 2012, at approximately one o'clock in the morning, appellant was driving home in her Chrysler PT Cruiser with an intoxicated passenger after leaving a bar when she struck a pedestrian, Gilbert Reyna, who died as a result of the injuries he sustained. At the time, Gilbert was pushing a bicycle on the side of the road. He was accompanied by his brother, Jesse Reyna. Jesse testified that he and Gilbert were walking on the shoulder of the road when, suddenly, a vehicle struck Gilbert; however, Jesse could not identify the vehicle nor its driver, since the driver continued driving without stopping and "a lot of dirt and dust" obstructed his view as the vehicle drove away. When morning came, appellant's passenger informed investigating officers that appellant might have been involved in the accident. Based on this tip, investigators made contact with appellant, who admitted that she struck something on the road and continued driving without stopping. Appellant was then taken into custody.

During a police interview admitted into evidence, appellant acknowledged that she considered the possibility that she had hit a person, but consistently stated that she thought it was an animal or a sign. She admitted that she had been reaching down to pick up a cigarette when, suddenly, she heard something hit her windshield. She admitted that she had been drinking at a bar earlier that night with her passenger, that she was tired at the time of the accident, that her intoxicated passenger was distracting her by being loud, and that she had to turn up the radio to drown him out. Appellant first stated that she went straight to sleep after she arrived home, but later revealed that her passenger drove her back to the scene. She stated that the police had already arrived when they returned to the scene and that, although she wanted to talk to the authorities, her passenger persuaded her to wait until the morning.

**\*2** Vivian Sanchez, an inmate who was in jail with appellant after her arrest, testified that appellant admitted

that she had consumed two shots of tequila and two beers on the night of the accident and that, after the accident, she attempted to wash blood off her car with Clorox and water. Regarding appellant's reason for not stopping, Sanchez testified:

> [Appellant] said, "I was too drunk to go back. I'm not going to go back. Do you think I'm going to go back and get arrested? No." And then [appellant] was upset because whoever she was with, I don't know the name, I don't recall the name, that person was yelling for her to go back. And she said, "No. I'm going to wash this off, and I've got to get it done tonight." And she did.

The police investigation revealed that, a few hours after the accident, appellant replaced her broken windshield with a new one, and that there were white marks on appellant's car indicative that someone had tried to clean it. The lead investigator on the case testified that he elected not to request a blood sample from appellant to determine alcohol content because too much time had elapsed between the time of the accident and his initial contact with her to get an accurate result.

The evidence showed that on the night of the hit-and-run, Gilbert was wearing a black shirt and khaki shorts; his bicycle was dark and chrome in color; and there was "a lot of light" in the area where the accident occurred. According to Jesse, lights from a nearby building provided additional visibility. Officers who collected evidence at the accident scene testified that, although they were able to recover Gilbert's bicycle, they could not locate a bicycle reflector at the scene; however, Jesse testified that the bicycle was equipped with a reflector underneath the seat prior to the accident.

The jury found appellant guilty and assessed punishment at fifteen years in prison for manslaughter, ten years in prison for tampering with or fabricating physical evidence, and ten years in prison for accident involving personal injury or death, with the sentences to run concurrently. The jury also assessed a $10,000 fine on each of the three counts. This appeal followed.

## II. Discussion

### A. Sufficiency of the Evidence

By her fourth issue, appellant contends the evidence was insufficient for a rational jury to convict her of

manslaughter.[2] Specifically, appellant contends that no evidence was presented that she "recklessly" caused Gilbert's death. *See* TEX. PENAL CODE ANN. § 19.04.

We conduct our sufficiency review by applying the *Jackson v. Virginia* standard of review. *See Brooks v. State,* 323 S.W.3d 893, 906 (Tex.Crim.App.2010) (plurality op.). Under this standard, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see Brooks,* 323 S.W.3d at 902 n.19. The jury is the "exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence." *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex.Crim.App.2000). The standard for reviewing the sufficiency of the evidence is the same for both direct and circumstantial evidence. *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex.Crim.App.1999).

**\*3** Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1997). A hypothetically correct jury charge is one that "sets out the law, is authorized by the indictment, does not unnecessarily increase the state's burden of proof or unnecessarily restrict the state's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

A person commits manslaughter if she recklessly causes the death of an individual. *See* TEX. PENAL. CODE ANN.. § 19.04(a). A person acts recklessly with respect to the result of her conduct when she is aware of, but consciously disregards, a substantial and unjustifiable risk that the result will occur. *Id.* § 6.03(c) (West, Westlaw through 2013 3d C.S.). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actor's standpoint. *Id.*; *Garza v. State*, 50 S.W.3d 559, 564 (Tex.App.–Houston [1st Dist.] 2001, no pet.). "[P]roof of a culpable mental state generally relies on circumstantial evidence." *Lopez v. State,* 630 S.W.2d 936, 942 (Tex.Crim.App. [Panel Op.] 1982) (quoting *Dillon v. State,* 574 S.W.2d 92, 94 (Tex.Crim.App. [Panel Op.] 1978)). A culpable mental state may be inferred from the defendant's acts, words, and conduct. *Dues v. State,* 634 S.W.2d 304, 306 (Tex.Crim.App.1982). "At the heart of reckless conduct is conscious disregard of the risk created

by the actor's conduct." *Lewis v. State,* 529 S.W.2d 550, 553 (Tex.Crim.App.1975). Recklessness can be applied generally to the act of driving. *See Porter v. State,* 969 S.W.2d 60, 63 (Tex.App.–Austin 1998, pet. ref'd).[3] In a manslaughter case, the jury is not required to find that a defendant was aware of the specific risk of the victim's death to find recklessness. *See Trepanier v. State,* 940 S.W.2d 827, 829 (Tex.App.–Austin, 1997 pet. ref'd).

Appellant challenges the sufficiency of the evidence as to the mental state element of manslaughter requiring the State to prove that she recklessly caused Gilbert's death.[4] The State's manslaughter indictment alleged that appellant was reckless "by failing to control her motor vehicle, [failing] to keep a proper lookout, [failing] to maintain a single lane of travel, [failing] to keep her vehicle on the roadway, and by driving her motor vehicle onto the shoulder of the roadway." Here, by her own admission, appellant was voluntarily intoxicated and distracted at the time of the accident. Appellant admitted that she consumed two shots of tequila and two beers at a bar before the accident. She also admitted that she was "drunk," tired, distracted by her passenger, and reaching for a cigarette in her car moments before she struck Gilbert. Appellant's admission that she was intoxicated, fatigued, and distracted on the road demonstrated to a rational jury that she consciously created a substantial and unjustifiable risk of danger to others. *See Rodriguez v. State,* 834 S.W.2d 488, 490 (Tex.App.–Corpus Christi 1992, no pet.) (holding evidence legally sufficient based on appellant's statement that she took the corner "too fast," which indicated that she was aware of the risk created by her conduct); *see also Rubio v. State,* 203 S.W.3d 448, 452 (Tex.App.–El Paso 2006, pet. ref'd) (observing that driving under the influence of alcohol can be used to show conscious disregard of substantial risk). It does not matter that appellant may not have perceived the specific risk that her conduct would cause another person to die; what matters is that she consciously created an unjustified risk of danger to others. *See id.*

**\*4** Moreover, the jury could have reasonably inferred that nothing prevented appellant from noticing Gilbert on the side of the road before she struck him. The jury heard evidence that (1) the bicycle Gilbert pushed was partially chrome in color and equipped with a reflector underneath the seat, (2) lights from a nearby building illuminated the area, (3) Gilbert was wearing khaki shorts, and (4) Gilbert was walking on the shoulder of the road.[5] Although Gilbert was reasonably visible to drivers on the road, there was no evidence that appellant made any attempt to avoid the accident; for instance, Jesse testified that he did not hear the sound of any squealing tires before appellant struck Gilbert, and investigators could not locate any skid marks at the scene. Furthermore, appellant admitted that she was searching for a cigarette in her car when, suddenly, she hit something on the road. Appellant's admission that she was distracted on the road could have indicated to a rational jury that the accident was not due to poor visibility conditions, as appellant argued at trial; rather, it was due to her failure to keep a proper lookout and maintain a single lane, as the State alleged in its indictment.

Finally, the jury could have inferred appellant's recklessness from her furtive conduct after the accident that demonstrated her consciousness of guilt. *See Cockrum v. State,* 758 S.W.2d 577, 581 (Tex.Crim.App.1988) (holding that the defendant's demeanor after the crime, in the form or nervous or furtive behavior, may indicate guilty knowledge and be used as evidence of guilt). The evidence showed that appellant continued driving after she hit Gilbert, that she made no attempt to stop, and that she went to an auto glass shop to replace her broken windshield as soon as the morning came. The investigating officer who made initial contact with appellant noticed white marks on the surface of appellant's car, which appeared to the officer as though someone had tried to remove something from the surface. Appellant further showed a consciousness of guilt when she told Sanchez that she was "too drunk" to remain at the accident scene, that she fled to avoid being arrested, and that she washed blood off her car with Clorox and water after the accident.

Viewed in the light most favorable to the prosecution, the evidence showed that appellant allowed her vehicle to veer onto the shoulder of the road as a result of a combination of factors that, taken together, indicated she consciously created and disregarded a substantial and unjustified risk of harm to the people around her. Because we do not believe it was unreasonable for the jury to find the element of recklessness beyond a reasonable doubt, we overrule her fourth issue.

## B. Evidentiary Rulings

By her first and third issues, appellant contends that the trial court made improper evidentiary rulings that prejudiced her ability to present a defense.

### a. Area of Impact (State's Exhibit Number 9)

By her first issue, appellant contends that the trial court

erred in allowing the State to introduce a diagram of the accident scene into evidence. Specifically, appellant complains of a representation in the State's diagram, which indicated that her car struck Gilbert in an area that was situated exclusively within the shoulder of the road, referred to in the diagram as "AOI" or "area of impact." Appellant asserts the area of impact designation should not have been admitted into evidence on the basis that (1) the officers who investigated the accident scene were not proper lay witnesses under Texas Rule of Evidence 701 because they did not see the accident occur and, therefore, could not render an opinion about the area within which the impact could have occurred; (2) the officers were not qualified as experts under Rule 702 to render an opinion about where the impact could have occurred; and (3) the probative value of the evidence concerning area of impact was substantially outweighed by the danger that it could mislead the jury and unfairly prejudiced her case under Rule 403.

### 1. Pertinent Facts

**\*5** The trial court held a hearing outside the presence of the jury to determine the admissibility of the area of impact designation in the State's diagram. Two officers testified about how they determined the area of impact. Regarding the area of impact, the officers testified to the following: (1) they based the area of impact on the first piece of debris they came upon on the right side of the road; (2) Jesse, who was present for the accident, did not know where the impact actually occurred and did not aid the officers in making the determination; (3) the area of impact was not determined by utilizing any kind of scientific theory or principle; (4) the officers were not experts in the field of accident reconstruction or the like; and (5) it is common in the investigation of an accident involving a fatal hit-and-run of a pedestrian with no witnesses to determine the area of impact by reviewing the spread of debris found on the road. The officers also testified that "area of impact" is not the same as "point of impact." The "area of impact" refers to the general area within which the "point of impact" is believed to have occurred. The officers testified that it was not possible to identify a point of impact in this case. On cross-examination, both officers testified that the diagram may not accurately depict the actual size of the area of impact; they testified that, although the diagram limited the area of impact to the shoulder of the road, the actual area could be six to ten feet wider than it is shown in the diagram and could have extended onto the road.

After hearing all of this testimony, the trial court overruled appellant's objections and allowed the State to introduce the diagram into evidence; however, the court provided the following cautionary instruction to the State:

> Okay, I'm going to let [the diagram depicting the area of impact into evidence] as long as the State understands, that the State needs to have sufficient explanation of what it is and not mislead the jury that it's something other than what it is. It's not scientific evidence, it's not based on any sort of scientific determination, and also that the circle that's drawn in the shoulder is not necessarily ... even accurate. Both officers already testified that the area of impact could be much greater than [it is depicted in the diagram] and could extend out into the roadway.

### 2. Analysis

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Shuffield v. State,* 189 S.W.3d 782, 793 (Tex.Crim.App.2006). A trial court does not abuse its discretion if its decision falls within the zone of reasonable disagreement. *See Walters v. State,* 247 S.W.2d 204, 217 (Tex.Crim.App.2007). We will sustain the trial court's decision if that decision is correct on any theory of law applicable to the case. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990).

Generally, "observations which do not require significant expertise to interpret and which are not based on a scientific theory can be admitted as lay opinions if the requirements of [Texas Rule of Evidence] 701 are met." *Osbourn v. State,* 92 S.W.3d 531, 537 (Tex.Crim.App.2002). Under Rule 701, a lay witness can testify in the form of an opinion if the opinion is (a) rationally based on his or her perceptions and (b) helpful to the clear understanding of the testimony or the determination of a fact in issue. *See* TEX. R. EVID. 701; *see also Fairow v. State,* 943 S.W.2d 895, 898 (Tex.Crim.App.1997).

The first requirement for admissibility, perception, refers to a "witness's interpretation of information acquired through his or her own senses or experiences at the time of the event (i.e., things the witness saw, heard, smelled, touched, felt, or tasted)." *Osbourn,* 92 S.W.3d at 535. Thus, a witness's testimony can include opinions, beliefs, or inferences "as long as they are drawn from his or her own experiences or observations." *Id.* Once the perception requirement is satisfied, the trial court must then determine if the opinion is "rationally based on that perception. An opinion is rationally based on perception if it is an opinion that a reasonable person could draw under the circumstances." *Fairow,* 943 S.W.2d at 899–900.

The second requirement for admissibility under Rule 701 is that the opinion must be "helpful to the trier of fact to either understand the witness's testimony or to determine a fact in issue." *Id.* There is no bright line indicating when an opinion is helpful, but the court of criminal appeals has explained that "general evidentiary considerations of relevance and balancing will invariably assist the trial judge in making his determination." *Id.* For example, "a trial court properly acting within its discretion may determine that the confusing, misleading or cumulative nature of an opinion renders it not helpful to the trier of fact and thus improper under Rule 701." *Id.* at 900. Even if a lay opinion meets both requirements under Rule 701, a trial court has discretion under Rule 403 to exclude the opinion if its probative value is substantially outweighed by a danger of unfair prejudice or misleads the jury. *See* TEX. R. EVID. 403.

**\*6** Here, the trial court could have reasonably concluded that the officers' opinion as to the area of impact was not based on a scientific theory and did not require significant expertise to interpret because the officers based their opinion on a review of the spread of debris found on the road, which they personally witnessed. *See Osbourn,* 92 S.W.3d at 537; *see also Brown v. State,* 303 S.W.3d 310, 320 (Tex.App.–Tyler 2009, pet. ref'd) (holding that officer did not require expert qualification to render an opinion about where the vehicle accident occurred because he observed the evidence at the accident scene first hand and formed his opinion, in part, on a review of the spread of debris on the road). Thus, following *Osbourn,* the diagram limiting the area of impact to the shoulder of the road was admissible if it met the requirements of Rule 701—i.e., a reasonable person under the circumstances could draw the same conclusion regarding the area of impact, and the diagram was helpful to the jury. *Osbourn,* 92 S.W.3d at 537; *Fairow,* 943 S.W.2d at 899–900.

It appears that the trial court, after hearing the testimony of the officers, determined that the diagram's depiction of the area of impact was not necessarily reflective of the officers' opinion concerning the actual size of the area of impact; although the diagram limited the area of impact to the shoulder of the road, the officers testified that the actual area of impact was not necessarily limited to the shoulder and could have extended out onto the roadway. Although the trial court acknowledged that the diagram's depiction of the area of impact was "not necessarily ... accurate," the trial court reasonably determined that this evidence would be helpful to the jury as long as the State, in presenting the evidence, "sufficient[ly] explain[ed]" the inaccuracy and did not mislead the jury into believing that the area of impact was limited to the shoulder of the road. Our review of the record indicates that the State heeded the trial court's curative instruction by presenting the diagram in a manner that accurately illustrated the officers' testimony concerning the area of impact. Considering the manner in which the jury received the evidence at issue, we cannot conclude that the trial court abused its discretion in ruling the way it did.[6] *See Fairow,* 943 S.W.2d at 899–900.

Even if we were to assume that the trial court erred in admitting the complained—of portion of the diagram into evidence, we would nevertheless be compelled to conclude that the error, if any, was harmless. We review the erroneous admission of evidence under a harm analysis for nonconstitutional error. *See Walters v. State,* 247 S.W.3d 204, 219 (Tex.Crim.App.2007). Under this analysis, we must disregard a nonconstitutional error that does not affect the defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b). The erroneous admission of evidence does not affect substantial rights if this Court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *See Solomon v. State,* 49 S.W.3d 356, 365 (Tex.Crim.App.2001). In making this determination, we consider "everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State,* 32 S.W.3d 862, 867 (Tex.Crim.App.2000). We also consider other factors, including jury instructions, the State's theory, any defensive theories, and closing arguments. *See Motilla v. State,* 78 S.W.3d 352, 355 (Tex.Crim.App.2002).

After examining the record as a whole, we have a fair assurance that the diagram limiting the area of impact to the shoulder of the road did not influence the jury. The

record shows the State heeded the trial court's admonishment to not mislead the jury when presenting the evidence concerning area of impact; none of the officers on direct examination testified that their determination of the area of impact was based on a scientific principle or theory, and they were candid about their lack of expertise in any relevant field. *See Brown,* 303 S.W.3d at 321 (concluding that any error in admitting an improper lay witness opinion concerning the situs of the vehicle accident was harmless because the witness was candid about the limitations of his training in accident investigation, and he did not profess to have more training and experience than he actually possessed). Furthermore, the State, in its closing argument to the jury, made no mention of the area of impact in the diagram and, thus, did not emphasize the alleged error—a consideration which weighs against a finding of harm. *See Motilla,* 78 S.W.3d at 356 (observing that the State's emphasis of the error at trial is a factor to be considered in harm analysis); *King v. State,* 953 S.W.2d 266, 272 (Tex.Crim.App.1997) (same). Moreover, the officers testified on cross-examination that the area of impact could extend beyond the shoulder and onto the roadway, and they even went so far as to edit the State's previously introduced diagram to accurately depict the size of the area of impact; the record reflects that both officers, using a pen on the witness stand, drew a wider circle on an identical copy of the State's diagram, which expanded the area of impact beyond the shoulder and onto the roadway. These edited versions of the State's diagram were introduced into evidence as defense exhibits eight and eleven for the jury to review.

**\*7** In finding harmless error, we recognize that appellant's defensive theory involved refuting the State's evidence that she drove on the shoulder of the road by attempting to demonstrate that Gilbert was walking in her lane of travel at the time of the accident. We also recognize that the State's diagram, which limited the area of impact to the shoulder of the road, was at odds with appellant's defensive theory. However, even without the State's diagram in evidence, the jurors were presented with other evidence indicating appellant struck Gilbert on the shoulder; for instance, Jesse testified that Gilbert stayed on the shoulder of the road at all times during their walk home. Additionally, appellant, in her video interview, stated that she believed she might have hit a sign, which, by way of reasonable inference, meant the impact did not occur in her lane of travel unless there was a sign in her lane of travel, and there was no evidence of that. Thus, while the State's diagram was inconsistent with appellant's defensive theory, the jurors could have reasonably rejected her theory based on other testimony indicating she struck

Gilbert by recklessly driving on the shoulder of the road. *See Anguiano v. State,* 774 S.W.2d 344, 347 (Tex.App.–Houston [14th Dist.] 1989, no pet.) (finding error was harmless because "there was other testimony [other than the erroneously admitted testimony] upon which the jury could reach its own determination"). Appellant's first issue is overruled.

**b. Personal Driving Experiences of Witnesses**

By her third issue, appellant contends the trial court erred in not allowing her to question certain witnesses about their personal driving habits and experiences on the road. Specifically, appellant asserts she had a constitutional right to poll several witnesses, who were all police officers, to determine whether they had ever divided their attention while driving on the road in order to change the radio station, use a cell phone, turn to talk to a passenger, or reach for a dropped item.[7] In support of this proposition, appellant cites the cases of *In re Winship,* 397 U.S. 358 (1970) and *Crocker v. State,* 573 S.W.2d 190 (Tex.Crim.App.1978), and argues the trial court's evidentiary rulings were contrary to those cases. However, *In re Winship* and *Crocker* concern the constitutional standard of proof required to secure a juvenile or adult criminal conviction; they do not concern evidentiary rulings at the trial level involving cross-examination of witnesses, and appellant does not adequately explain, nor can we discern, how they apply to this case. Appellant has failed to provide a clear and concise argument with citations to the record and authority to support her third issue; it is therefore inadequately briefed for our review. *See* TEX. R. APP. P. 38.1(i).

Nevertheless, we conclude that appellant's argument is without merit. A review of the record indicates that, prior to the evidentiary rulings made the basis of this issue, appellant had already polled not one, but two State's witnesses with questions identical to the ones she sought to ask subsequent witnesses.[8] The trial court has broad discretion to impose reasonable limits on cross-examination to prevent the injection of cumulative evidence. *See Lopez v. State,* 18 S.W.3d 220, 222 (Tex.Crim.App.2000) (citing *Lagrone v. State,* 942 S.W.2d 602, 613 (Tex.Crim.App.1997)); *see also* TEX. R. EVID. 403 (stating that even relevant evidence may be excluded if the trial court determines that "its probative value is substantially outweighed by ... needless presentation of cumulative evidence."). Thus, even assuming the questions appellant sought to ask subsequent witnesses were relevant to the case, the trial court acted within its discretion to

avoid the presentation of cumulative evidence. We therefore overrule appellant's third issue.

## C. Motion to Suppress

**\*8** By her second issue, appellant contends the trial court erred in denying her motion to suppress certain text messages found on appellant's company-issued cell phone that police obtained after appellant's employer, who is also appellant's mother, provided written permission to search the phone. Specifically, appellant, citing *State v. Granville,* argues she had a legitimate and reasonable expectation of privacy in the contents of her cell phone. 423 S.W.3d 399 (Tex.Crim.App.2014) (holding a defendant normally has a reasonable expectation of privacy in his or her cellular telephone that is stored temporarily in a jail property room following arrest); *Riley v. California,* ——— U.S. ———, 134 S.Ct. 2473 (2014) (holding police generally may not, without a warrant, search digital information on a cell phone seized from a person who has been arrested). The State responds that appellant did not reasonably expect privacy in the contents of her cell phone under the Fourth Amendment, and, even if she did, appellant's employer had actual or apparent authority to consent.

## 1. Pertinent Facts

The trial court held a hearing on appellant's oral motion to suppress certain text messages that police obtained from appellant's company-issued cell phone. At the hearing, Teresa Ann Butler, appellant's employer and mother, testified that she owns a transportation company, that appellant worked for the company, and that appellant was issued a cell phone as part of her employment. Butler testified to the following facts regarding the nature of appellant's use of this cell phone:

> [Defense]: Was the phone for the exclusive use of [appellant]?
>
> [Butler]: Yes.
>
> [Defense]: Did anybody else use that phone?
>
> [Butler]: No.
>
> [Defense]: Okay. Was she authorized to use [the phone] for her personal use as well?
>
> [Butler]: Yes.

> [Defense]: Okay. Did the company have any written protocols or requirements for the use of that phone?
>
> [Butler]: No.
>
> [Defense]: Did the company do any searches of that phone or checks of the actual physical phone, itself, at any time?
>
> [Butler]: No.
>
> [Defense]: Was that something that was not any type of overt policy for the company to regularly check that phone?
>
> [Butler]: No.
>
> [Defense]: You, as the owner of the company, did you consider that to be [appellant's] phone?
>
> [Butler]: Yes.

On cross-examination, the State elicited testimony from Butler that the phone was purchased with company funds and that appellant would not be able to make use of it if the company stopped paying the phone bill. After hearing Butler's testimony, the trial court asked the prosecutor whether the police obtained consent from any party to search the phone. The prosecutor responded that Sergeant Schwartz, a State's witness, would be able to speak directly to the issue of consent, but that he was not scheduled to testify until later in the trial. Appellant's counsel then proposed that the trial court reserve ruling on the motion to suppress until after the State adduced additional evidence from Sergeant Schwartz on the issue of consent. The trial court took the consent issue under advisement and reserved ruling on appellant's suppression motion.

Later at trial, immediately prior to Sergeant Schwartz's testimony, the trial court asked the State if it had additional evidence to present on the issue of consent, and the State responded, "[w]e talked to [Sergeant Schwartz], Judge. He said that he obtained consent from [Butler] and never asked [for consent] from [appellant]." The trial court then ruled the cell phone messages were admissible. After the trial court ruled on appellant's motion to suppress, defense counsel asked the State to stipulate that Sergeant Schwartz never obtained consent from appellant to search her phone. The State did not agree to the stipulation at that time but indicated that it would do so "after talking to [Sergeant Schwartz]." Trial on the merits recommenced with

Sergeant Schwartz testifying to the following facts regarding consent, which drew no objection from the defense:

> **\*9** When I took [appellant] into custody, I—the phone was given to [Butler]. I contacted [Butler] to see about getting the phone so I could search it. I was able to get permission from [Butler] since the phone is paid for by [Butler]. [Butler] told me it's a company phone. So she gave me consent to—a handwritten consent to search the phone for text messages.

Defense counsel also cross-examined Sergeant Schwartz on the consent issue. Later at trial, when the State sought to introduce the content of these text messages into evidence, appellant objected on Fourth Amendment grounds. The trial court overruled appellant's objection, and admitted, as State's Exhibit 33, the text messages into evidence. Included in State's Exhibit 33 is a handwritten letter, signed by Butler and dated May 30, 2012, in which Butler expressly grants Sergeant Schwartz permission to "download any text or voicemail messages" from the cell phone. In this consent letter, Butler described the phone as "one of my company cell phones." The State also introduced appellant's May 29, 2012 video interview with Sergeant Schwartz, wherein appellant referred to her phone as a "company phone."

**2. Applicable Law and Standard of Review**

The Fourth Amendment to the United States Constitution provides protection from "unreasonable" searches and seizures by government officials. *Hubert v. State,* 312 S.W.3d 554, 560 (Tex.Crim.App.2010). A search conducted without a warrant is generally deemed unreasonable. *Id.* The general warrant requirement yields to several well-established exceptions. *Id.* One exception applies when a person voluntarily consents to a search. *Id.* We examine the totality of the circumstances to determine whether it is reasonable under the Fourth Amendment for an officer to rely on the consent of another person to justify a warrantless search of property. *Id.*

A third party may consent to a search of the property of another if the third party has actual authority over the thing to be searched. *Id.* The property interests of the parties are

relevant, but not dispositive, to this determination. *Id.* Common authority is shown by the parties' joint access, mutual use, or control over the property for most purposes, so that "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 560–61 (quoting *United States v. Matlock,* 415 U.S. 164, 172 (1974)). When a defendant assumes the risk that another may permit a search of shared property, he may not complain of that search under the Fourth Amendment. *Id.* at 561.

A third party's actual authority over the property is not a prerequisite for a valid consensual search. *Id.* Our law also recognizes that, in some circumstances, a valid consensual search may occur when a third party has "apparent authority" over the property. *Id.* The Texas Court of Criminal Appeals recently explained:

> [W]hen an officer reasonably, though erroneously, believes that a third party purporting to provide consent has actual authority over the place or thing to be searched, apparent authority exists and the purported consent from the third party can serve to make the search reasonable. Even if the third party lacks actual authority to consent—that is, he does not actually have joint access to or control over the premises—his purported consent can nevertheless validate a search if it reasonably appears to the police that he does in fact have authority.

**\*10** *Id.* at 561. Apparent authority is judged under an objective standard: "would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Limon v. State,* 340 S.W.3d 753, 756 (Tex.Crim.App.2011) (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990)).

It is the State's burden to show by a preponderance of the evidence that the person who consented to the search had actual or apparent authority to consent. *Hubert,* 312 S.W.3d at 561–62. Thus, the State has the burden to show that a third party either had mutual access to and control over the property that was searched (i.e., actual authority),

or that the officer conducting the search reasonably believed, based on facts known to him at the time, that the consenting party had authority over the property (i.e., apparent authority). *Id.*

Whether a search was reasonable under the Fourth Amendment is a mixed question of law and fact. *St. George v. State,* 237 S.W.3d 720, 725 (Tex.Crim.App.2007). We review de novo the issue of whether a third party had actual or apparent authority to consent to a search of another's property because this inquiry involves a mixed question of law and fact. *Hubert,* 312 S.W.3d at 559–60. However, we must defer to the trial court on determinations of credibility and historical fact. *Id.* When the trial court does not make findings of fact, we view the evidence in the light most favorable to the trial court's rulings and assume that the trial court resolved any issues of historical fact or credibility in a manner that is consistent with its ultimate ruling. *Id.* at 560.

In reviewing a trial court's ruling on a motion to suppress, we generally consider only evidence presented at the suppression hearing because the trial court based its ruling on it rather than evidence adduced later in trial. *See Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App.1996). However, when the parties "consensually relitigate" the suppression issue after the trial court's ruling on the suppression motion, our review is not limited to the evidence adduced at the suppression hearing, but also includes the relevant trial testimony and evidence. *Id.*

### 3. Discussion

As a threshold matter, we note that our review of the evidence is not limited to the evidence adduced at the suppression hearing because the record reflects that the parties consensually relitigated the suppression issue after the trial court ruled on appellant's motion to suppress. *See id.* As noted earlier, appellant sought a stipulation from the State on the issue of consent after the trial court had already denied her motion to suppress. The State did not agree to enter this stipulation until Sergeant Schwartz testified at trial, and, when Sergeant Schwartz did testify at trial, the defense cross-examined him on the consent issue. Thus, appellant elected to reopen the evidence after the trial court made its suppression ruling, and we accordingly also consider the evidence introduced at trial in our review of this issue. *See id.* (holding that when the State raises the suppression issue at trial, either without objection or with the defense's subsequent participation in the inquiry, the defendant is deemed to have elected to reopen the

evidence, and the appellate court's review incorporates the relevant trial testimony and evidence).

**\*11** Under the doctrine of apparent authority, even if Butler lacked actual authority to consent, her purported consent will validate the search at issue if it reasonably appeared to Sergeant Schwartz that Butler did in fact have authority. *See Hubert,* 312 S.W.3d at 561; *Davis v. State,* 93 S.W.3d 664, 668 (Tex.App.—Texarkana 2002, pet. ref'd) (observing that "it is arguable [whether the third-party consenter had] actual authority to consent to a search. That is not, however, the operative question, because even when the facts do not support a finding of actual authority, a search is reasonable if the consent-giver *apparently* has actual authority.") (emphasis added). On May 29, 2012, during her video interview with Sergeant Schwartz, appellant described her phone as a "company phone." The next day, when Sergeant Schwartz sought consent from Butler to search the phone, Butler described it as "one of my company cell phones." Butler was also in possession of the phone at that time. *See Wilson v. State,* No. 04–02–00805, 2004 WL 624541 at \*3 (Tex.App.—San Antonio Mar. 31, 2004, no pet.) (mem. op., not designated for publication) (holding apparent authority to consent to search vehicle was established where consent-giver asserted it was his vehicle and was in possession of it at time of search, even though it was not his vehicle). Under these circumstances, there was no ambiguity in the situation that should have given Sergeant Schwartz pause to doubt Butler's authority over the phone, an item that both appellant and Butler admittedly identified as a company phone. *See Corea v. State,* 52 S.W.3d 311, 317 (Tex.App.— Houston [1st Dist.2001], pet. ref'd) (noting that law enforcement officers should not be permitted to proceed when ambiguous circumstances exist that merit further inquiry into the consenting party's apparent claim of authority to allow the search); *State v. Krall,* No. 13–12–00469–CR, 2013 WL 6547388, at \*5 (Tex.App.—Corpus Christi Aug. 1, 2013, no pet.) (mem. op., not designated for publication) (finding that defendant-passenger's statement that duffel bag belonged to him gave rise to "ambiguous circumstances" that should have raised a question in the mind of the officer as to whether the driver had actual authority to consent to a search of defendant-passenger's bag). Moreover, nothing in the record indicates that Butler, at the time she consented, told Sergeant Schwartz that the phone was intended for appellant's exclusive use, as she had represented at the suppression hearing. Finally, there is no indication in the record that appellant prevented Butler or anyone else from viewing the contents of her phone—for example, by installing a password-protection

feature—which would have alerted Sergeant Schwartz to question Butler's authority.

Having considered the arguments of the parties, we conclude that the trial court properly denied appellant's motion to suppress on the basis that Butler had apparent authority to consent to a police search of appellant's company-issued phone. *See Hubert,* 312 S.W.3d at 561. Based on the facts known to Sergeant Schwartz at the time of the search, it was reasonable for him to believe that Butler possessed authority to consent. *See id.*

**5. Harm**

Even if we were to decide that the trial court erred in admitting the text messages into evidence, we would find the error was harmless. Because the error, if any, impacted appellant's constitutional rights under the Fourth Amendment, we must determine whether the error was harmless beyond a reasonable doubt. *See Brown v. State,* 960 S.W.2d 265, 271 (Tex.App.—Corpus Christi 1997, no pet.) (observing that "[i]mproperly admitted evidence [impacting constitutional rights] does not call for reversal if the reviewing court determines beyond a reasonable doubt that admission of the evidence did not contribute to the conviction or punishment"); *see also* TEX. R. APP. P. 44.2(a).

To analyze harm, we provide the following summary of the incriminating content found on appellant's phone and admitted into evidence: (1) a few hours after the accident, appellant texted Brian Welch, her passenger, that she passed by the scene and noticed that a sign had been knocked down; (2) appellant referenced her broken windshield and indicated the need to replace it; (3) appellant texted Welch that she consumed only "one" drink on the night of the accident and then accused him of telling others she was "drunk," which Welch, in a subsequent responsive text to her, denied;[9] and (4) Welch texted appellant, "[D]ude you ran over and killed someone[.] [H]ere is the police report[.]"

A review of the record indicates that the jury heard the substantive equivalent of the incriminating text-message content through other admissible evidence and testimony at trial. For instance, during her video interview with Sergeant Schwartz, which was admitted at trial, appellant revealed that (1) she thought initially the object she hit might have been a sign; (2) she replaced her windshield the morning of the hit-and-run; (3) she consumed one vodka tonic at a bar before the accident occurred; and, (4) she received a text message from Brian Welch the morning of the accident, in which Welch advised her that he read a report on the internet about a hit-and-run in the area and asked if she believed the object she hit might have been a person. The jury also heard, through the testimony of Sanchez, appellant's admission that she consumed alcohol on the night of the accident, that she attempted to get rid of incriminating evidence, and that her reason for fleeing the scene was to avoid apprehension. Thus, the incriminating content found on appellant's phone and admitted into evidence was merely cumulative of what she told others after the accident. Accordingly, we conclude beyond a reasonable doubt that the admission of the text messages into evidence, even if error, did not contribute to appellant's conviction or punishment and was, therefore, harmless. *See Brown,* 960 S.W.2d at 272; *Coble v. State,* 330 S.W.3d 253, 286 (Tex.Crim.App.2010). We overrule appellant's second issue.

### III. Conclusion

**\*12** We affirm appellant's conviction.

**All Citations**

Not Reported in S.W.3d, 2015 WL 1869472

Footnotes

1    Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

2    Appellant's fourth issue asserts that the trial court erred in denying her motion for a directed verdict. A challenge to the denial of a motion for directed verdict is essentially a challenge to the legal sufficiency of the evidence. *See Cook v. State,* 858 S.W.2d 467, 470 (Tex.Crim.App.1993). Thus, we review appellant's fourth issue as a challenge to the legal sufficiency of the evidence to support her conviction.

3    *See also Aliff v. State,* 627 S.W.2d 166, 172 (Tex.Crim.App.1982) (finding recklessness was shown where defendant operated motor vehicle at over 100 miles per hour, passed a car on the shoulder, locked his brakes, and skidded into a collision with another car); *Trepanier v. State,* 940 S.W.2d 827, 830 (Tex.App.–Austin, 1997, pet.ref'd) (determining driver was reckless when he attempted to illegally pass traffic on right shoulder of the road); *Arellano v. State,* 54 S.W.3d 391, 393 (Tex.App.–Waco 2001, pet. ref'd) (finding reckless element satisfied where there were visible signs indicating reduced speed ahead and skid marks showed defendant was driving at an excessive speed under the circumstances); *Bannister v. State,* 761 S.W.2d 849, 850 (Tex.App.–Beaumont 1988, no pet.) (holding that recklessness was shown where truck driver put his truck in reverse during heavy fog on a highway and struck driver proceeding legally in the same lane).

4    Appellant does not challenge the sufficiency of the evidence on any other element to support her conviction for manslaughter.

5    *See Lopez v. State,* 731 S.W.2d 682, 684 (Tex.App.–Houston [1st Dist.] 1987) (holding recklessness shown where defendant struck a pedestrian on the shoulder of the road after failing to maintain a single lane on the road, and where the section of the road on which accident occurred was straight and there was nothing that would obstruct a driver's view), *rev'd on other grounds,* 779 S.W.2d 411 (Tex.Crim.App.1989); *see also Manning v. State,* 84 S.W.3d 15, 20–21 (Tex.App.–Texarkana 2002) (determining recklessness element was satisfied where the defendant swerved when approaching a lane of stopped traffic with visible warning signs of road construction, and never slowed down or applied his brakes), *rev'd on other grounds,* 114 S.W.3d 922 (Tex.Crim.App.2003).

6    For the same reason, we find the trial court did not abuse its discretion in ruling in favor of admissibility under Rule 403.

7    The purpose of asking these questions, according to appellant's offer of proof at trial, was to challenge the State's evidence of recklessness by showing that ordinary people might get distracted in various ways while driving; that such distractions are not a gross deviation from the standard of care that ordinary people would exercise; and that, if anything, it was appellant's normal distracted state that probably caused the accident to occur. Because the element of recklessness requires a gross deviation from the standard of care that ordinary people would exercise, appellant argued that she should be able to poll State's witnesses with questions to discover ordinary driving habits.

8    Appellant asked one witness the following questions, the substance of which is identical to the questions she posed in her offer of proof to the trial court:

    [Trial Counsel]: When you operate a motor vehicle, are you changing the radio?
    [Sergeant Kronk]: Yes, sir.
    [Trial Counsel]: When you change the radio sometimes you look down for a second, right?
    [Sergeant Kronk]: Yes, sir.
    [Trial Counsel]: Sometimes you talk—there will be someone in your car next to you, right?
    [Sergeant Kronk]: Yes, sir.
    [Trial Counsel]: You look over and talk to them, right?
    [Sergeant Kronk]: Yes, sir.
    [Trial Counsel]: You've done that before, right?
    [Sergeant Kronk]: Certainly.
    [Trial Counsel]: You have a cell phone?
    [Sergeant Kronk]: Yes, I do.
    [Trial Counsel]: You've answered your cell phone while you're driving before?
    [Sergeant Kronk]: Yes, I have.
    [Trial Counsel]: And there's been times you might have dropped an item while you're driving, right? I don't mean outside the window, I mean inside the car?
    [Sergeant Kronk]: I'm sure there is.
    [Trial Counsel]: And you're reached down to pick up an item, right?
    [Sergeant Kronk]: Once or twice, perhaps.
    [Trial Counsel]: You've done all of these things, haven't you?
    [Sergeant Kronk]: Yes, sir.

9    Appellant sent the following text message to Welch: "Why did [you] say [I] was drunk? [I] wasn't! [I] took ONE OF your vodka tonics, that wa[s] IT!"

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.